**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF GEORGIA**

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

FEB 18 2020

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

BRETT WALKER
Plaintiff,

v.

Superior Payment Solutions, CCS Finances,
Michelle Kowalick, Fahad Iqbal, Deenpal Singh,
Cynthia Nichols, Rolf Lorenz
Defendants.

CIVIL ACTION NO. 1:20-cv-00498-JPB-RGV

Second Amended COMPLAINT with detailed
allegations

**Explanation and Defendant modifications**

1. This COMPLAINT is the third entered for this case.
2. The first COMPLAINT mentioned violations for TCPA and 16 CFR Part 310.
3. The second (amended) COMPLAINT added defendants Kowalick, Khan, CCS Finances, & Superior Payment Solutions.
4. This COMPLAINT begins by correcting Defendant Khan's name to Fahad Iqbal, AKA Fahad Ali Khan, AKA Frank Knowles.
5. It continues by adding as Defendants, Deenpal Singh, Cynthia Nichols, and Rolf Lorenz.
6. Card Services Solutions is not a corporation registered anywhere and is removed as a Defendant.

**Preliminary Statement**

7. Plaintiff Brett Walker ("Plaintiff" or "Mr. Walker") brings this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See* Mims v. Arrow Fin. Servs., LLC, 132 S. Ct. 740, 745 (2012).
8. Mr. Walker alleges that Superior Payment Solutions, Inc. ("Superior Payment Solutions") commissioned automated telemarketing calls to his number on the National Do Not Call Registry. The calls were sent pursuant to an agreement between Superior Payment Solutions and its unnamed telemarketer ("Telemarketer",) which may be a subsidiary of Superior Payment Solutions. Despite Mr. Walker requesting on multiple occasions using the 'Press 2' option to be removed from the call list, Superior Payment Solutions continued to place automated calls to him.
9. Plaintiff Brett Walker currently resides in Atlanta
10. Defendant Superior Payment Solutions, Inc. is a New York corporation with its principal place of business operations at present time unknown to Plaintiff, but believed to be in the northeast US or Canada.

**Jurisdiction & Venue**

11. The Court has federal question subject matter jurisdiction over these TCPA claims. Mims, 132 S. Ct. 740.

12. The Court has personal jurisdiction over Superior Payment Solutions because it engaged in telemarketing calls to Mr. Walker and other potential customers into this district

13. Venue is proper under 28 U.S.C. § 1391(b)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this district, as the automated calls were made to Mr. Walker, who lives in Atlanta

**TCPA Background**

14. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing ... can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

15. The TCPA Prohibits Automated Telemarketing Calls to Cellular Telephones and Numbers Charged Per Call

16. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service or to a number that is charged per call." *See* 47 U.S.C. § 227(b)(1)(A). The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).

17. According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

18. The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14115, ¶ 165 (2003).

19. In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

    1  [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

20. In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 FCC Rcd. 1830, 1844 (2012) (footnotes omitted).

**The National Do Not Call Registry**

21. The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." Id.

22. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

23. The Growing Problem of Automated Telemarketing "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, Cutting Off Robocalls (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC chairman).

24. "The FTC receives more complaints about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991,

25. Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016), https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf.

26. In fiscal year 2017, the FTC received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016. Federal Trade Commission, FTC Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-nationaldo-not-call-registry-data-book-dnc.

27. The New York Times reported on the skyrocketing number of robocall complaints and widespread outrage about illegal telemarketing. Tara Siegel Bernard, Yes, It's Bad. Robocalls, and Their Scams, Are Surging, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html; see also Katherine Bindley, Why Are There So Many Robocalls? Here's What You Can Do About Them, Wall St. J. (July 4, 2018), https://www.wsj.com/articles/why-there-are-so-many-robocalls-heres-what-you-can-do-about-them-1530610203.

28. A technology provider combating robocalls warned that nearly half of all calls to cell phones next year will be fraudulent. Press Release, First Orion, Nearly 50% of U.S. Mobile Traffic Will Be Scam Calls in 2019 (Sept. 12, 2018), https://www.prnewswire.com/news-releases/nearly-50-of-us-mobile-traffic-will-be-scam-calls-by-2019-300711028.html.

**Factual Allegations**

Calls to Mr. Walker

29. Plaintiff Walker is a "person" as defined by 47 U.S.C. § 153(39). Mr. Walker's telephone number, (972) 740-XXXX, is assigned to a service for which he is charged per the call.

30. Mr. Walker's telephone number, (972) 740-XXXX, has been on the National Do Not Call Registry since 2003, over a decade before the calls at issue.

31. Mr. Walker's telephone number, (972) 740-XXXX, is used for residential purposes only.

32. Mr. Walker's telephone number, (972) 740-XXXX, is not associated with any business.

33. Since 2016, Mr. Walker has received at least 70 automated telemarketing calls from Superior Payment Solutions. When the calls began, Mr. Walker engaged the first few calls but gave up answering as the calls persisted despite his attempts to use the system (press '2' to be removed,) and direct verbal requests to the Telemarketer to make the calls stop.

34. These calls were made with an Automatic Telephone Dialer System ("Autodialer",) a term defined by the TCPA.

35. Mr. Walker knows the calls were made with an Autodialer because:
    a. The call have dead noise when he answered;
    b. The calls almost always come from a spoofed caller ID not related to the Defendant's business;
    c. The call is commercial in nature; and
    d. Before the call connects with a live individual, there is an audible click or pop, which the Mr. Walker recognizes as associated with a predictive dialing system

36. The Caller ID for multiple calls, 800-950-5114, is a "spoofed" number for Citi Cards. Those calls were made Oct. '19, Jan. '20, and Feb. '20

37. On January 6, 2020, Mr. Walker begins to pursue information and detail about the caller, not knowing the business name Superior Payment Solutions. The call is from 936-250-1665, another spoofed number not linked to any business.

38. A telemarketing sales representative eventually comes on the line from the Telemarketer and offers Superior Payment Solutions' service.

39. The agent James says he is calling from, among other things, Mr. Walker's "credit card companies," "Card services," "VISA MasterCard."

40. Mr. Walker provides real credit card information but false DOB and SSN information.

41. The Telemarketer then transfers Mr. Walker to customer service agent, Ava from Superior Payment Solutions.

42. Ava claims to be in New York, and work for 'Card Services Solutions', not Superior Payment Solutions. Mr. Walker hesitates about providing a real SSN and gets Ava's callback number of 800-372-7119.

43. On January 7, 2020, Mr. Walker calls Superior Payment Solutions from a different phone number and asks for a copy of the company's Do Not Call Policy. Managers James and Ted are told of the company's TCPA violations, and the additional $500 penalty if a DNC Policy is not produced upon demand. James and Ted verbally accuse Mr. Walker of extortion.

44. On January 10, 2020, Mr. Walker files with Fulton County Magistrate Court a Small Claims case against the only identified entity, Card Services Solutions, purporting to be in New Rochelle, NY.

45. Later that day, Mr. Walker freezes his credit file with the three reporting agencies, then provides Superior Payment Solutions his real social security number.

46. Superior Payment Solutions, with Mr. Walker's knowledge and assistance, opens a line of credit with Discover Card.

47. Before calling Discover, Superior Payment Solutions agent Walter Best explains to Mr. Walker to speak with Discover, not to mention a third party, simply to ask about, "the status of my application.", and not to mention any zero-percent interest rate.

48. While on the three-party call with Discover, Walter is silent.

49. At 1pm on January 14, 2020, Superior Payment Solutions sends Mr. Walker a contract to sign at hellosign.com, the PDF of which describes two unrelated companies, first 'fastezlending.com',

and second, named a Consultant, 'Pulsey Media.' The PDF is a 'DEBT MANAGEMENT CONSULTING AGREEMENT' between Mr. Walker and an unknown company 'Pulsey Media'.

50. During investigation, it is found that multiple businesses since 2012 have been using shared phone numbers, and a series of business addresses in the northeast (NJ, DE, NY, and Canada.)

51. Those businesses have angry customers, who leave a trail online of customer complaints, both at the Better Business Bureau (BBB) and at online call reporting sites like www.800notes.com and www.reportthecall.com.

52. Superior Payment Solutions is one such business, with a shutdown website and multiple BBB and call site complaints, but an active registration with the New York Department of State Corporations Division.

53. At 4pm Mr. Walker calls the number provided for Card Services Solutions, 800-372-7119, and the agent answers the phone, "Customer Service." Mr. Walker asks, "Is this Superior Payment Solutions?" The agent answers, "Yes."

54. Once the PDF is signed, Superior Payment Solutions attempts to charge $990 on Mr. Walker's credit card, which fails due to a lock on the Citibank mobile phone app, which prevents any charges.

55. At 5pm on January 14, Mr. Walker speaks to Superior Payment Solutions manager 'Ted' and shares the case number for the suit filed in Fulton County Magistrate Court.

56. At 10am on January 15, Mr. Walker calls from his 972-740-XXX cell phone, a phone number linked to Defendant Fahad Ali Khan, but does not leave a message.

57. At 1pm on January 15th, boggling the mind because of Ted's knowledge of the lawsuit, Walter with Superior Payment Solutions calls Mr. Walker to attempt again to charge Mr. Walker's credit card. Mr. Walker falsely tells Walter that his card should be able to be charged.

58. On that call Walter and manager Eric provide a convoluted explanation for why the contract signed was with Pulsey Media, and why there is no active website at www.fastezlending.com. The reason is that company is in a technology transition.

59. At 5pm on January 15, Mr. Walker speaks to Ted Jackson and asks for an address where a complaint and summons can be served. Ted refuses and responds, "If you want to go down that route, I do not want to know about your resources, but I probably have much more than you.

60. At 7pm on January 15, Mr. Walker speaks to agent Albert Rossi and tells him that four news agencies have been contacted about Superior Payment Solutions behavior. Mr. Rossi hangs up.

61. On January 16th at 5:40pm, Ted calls Mr. Walker and offers to refund the $990 that was never charged. Mr. Walker asserts the $14,000 in damages for the Small Claims suit. The call ends.

62. In January and February Mr. Walker sends subpoenas to Fahad Ali Khan, Michelle Jackson (Jackson may be the maiden name for Michelle Kowalick,) and employee Ava Kasper.

63. Ms. Kowalick's husband is the CEO of Portfolio Partners G.M.K. in Niagara Falls.

64. Ms. Kowalick responds to one subpoena request with two words that evoke an ominous taunt that plays a prominent role in the 2008 film *Taken*, "Good luck."

65. Three weeks later, on February 10th, again blowing the mind, the Telemarketer for Superior Payment Solutions again calls Mr. Walker, ending the call once they realize Mr. Walker has already engaged them for services.

66. Plaintiff and the other call recipients were harmed by these calls. They were temporarily deprived of legitimate use of their phones because the phone line was tied up during the telemarketing calls and their privacy was improperly invaded. Moreover, these calls injured

Plaintiff and the other call recipients because they were frustrating, obnoxious, annoying, were a nuisance, and disturbed the solitude of Plaintiff.

**Additional allegations - the Evolution of the Arrogant Actor.**

67. Plaintiff alleges the Defendant comes from a company whose actions led to an FTC injunction, and now Defendant engages in Do Not Call Registry and Telemarketing Sales Rule flagrancy.

68. Superior Payment Solutions was created out of Vision Asset Management Group at 2578 Niagara Falls Blvd. in Niagara Falls, New York. That company was named by the FTC in 2015 for violations of the Fair Debt Collection Practices Act. *Fed. Trade Comm'n v. Vantage Point Servs., LLC, 15-CV-006S, (W.D.N.Y. May. 15, 2015)* ("FTC v. VPS.")

69. The business model has changed to a lower risk profile, going from collection actions coercing debtors to convincing credit card balance holders of the existence of a line of credit whose interest is zero percent for life.

70. This modus operandi has less risks as cardholders are less defensive than debtors.

71. In May 2012 when SPS was formed Defendant Michelle Kowalick was employed as an Admin Assistant at Vision Asset Management Group ("VAMG",) That FTC v. VPS case includes an order by Judge Skretny which mentions the following, *"Plaintiffs contend that these businesses (Vantage, PMSI, Bonified, and the call initiators) are interconnected, and that Defendants structured their businesses as separate corporate entities in order to avoid liability. Specifically, by separating the debt collection business into (at least) three parts — the owner of the debt, the call initiator, and the payment processor — Defendants hoped to insulate themselves from any wrongdoing on the part of those who contacted consumers."*

72. Similar to Vantage Point et al, Defendants structured their call transfer and credit card balance transfer services, using the first telemarketing call center as a lead generator, the next as a customer service administrator, and the last as a closer.

73. In fact, Superior Payment Solutions customer service teams denied to Plaintiff that their company makes any outbound calls.

74. As Superior Payment Solutions and other companies, it and its Telemarketer have made thousands if not millions of robocalls regardless of recipients' Do Not Call Registry status, violating the Telephone Consumer Privacy Act 47 USC §227 ("TCPA")

75. As Superior Payment Solutions and other companies, it has enticed hundreds if not thousands of victims to pay up front for telemarketed debt and credit services, violating the FTC's Telemarketing Sales Rule 16 CFR Part 310 ("TSR".)

76. As Superior Payment Solutions and other companies, it violates state laws for unfair business practices.

77. Consumers have complained to the Better Business Bureau ("BBB") and online and telephone number reporting websites about the Defendants' actions. Superior Payment Solutions is the first such company, (two BBB Complaints – F rating) and has a website that is offline.

78. Card Services Solutions and CSS Solutions is the business name claimed by the Defendant when interacting with Mr. Walker (it has one BBB complaint and a D+ rating)

79. Other company names having phone numbers used by the Defendants include Educate Care Services (One BBB Complaint – B rating,) Nation Credit Services (Twelve BBB Complaints – F rating, website offline since Sep. '19) Credit Edu Care, CCS Finances (warning from BBB,) Debt

Financial Pro (no complaints yet as the website and dba name are likely lying in wait for future use.)

80. Typical complaints include upfront and fraudulent fees for credit card rate reduction services.

81. Online reports about phone numbers used by Defendants include reprehensible accusations.

82. One at reportthecall.com for phone number 800-372-7119 is, "These people called my father and tried to sign him up for a credit card and when I intervened I was cursed ad called. F'n *****. They told my dad to shut the F up and to go back to the trailer park and put his teeth back in."

83. One at scampulse.com for phone number 347-464-5537 is, "The next guy that calls me from 3474645537 back tries to bully me by threatening to find to my son's school and expose me to the PTA and the principal as a racist because he is black."

84. One BBB complaint for Nation Credit Services alleges, "Upon attempts at challenging them on thier (sic) claims i was cursed at, laughed at and threatened with physical violence."

**Superior Payment Solutions' Liability for Telemarketer's conduct**

85. For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." In re Rules & Regulations Implementing the TCPA, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd. 12391, 12397, ¶ 13 (1995).

86. In its January 4, 2008 ruling, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations. Id. (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

87. In fact, the Federal Communication Commission has instructed that sellers such as Superior Payment Solutions may not avoid liability by outsourcing telemarketing to third parties:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules, 28 FCC Rcd. 6574, 6588, ¶ 37 (2013) ("May 2013 FCC Ruling") (internal citations omitted).

88. On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." (May 2013 FCC Ruling, 28 FCC Rcd. At 6574, ¶ 1.)

89. The May 2013 FCC Ruling held that, even absent evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the

telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd. at 6586, ¶ 34.

90. The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

FCC Rcd. at 6592, ¶ 46.

91. Superior Payment Solutions is liable for the telemarketing calls that were initiated by Telemarketer.

92. Superior Payment Solutions hired Telemarketer to originate new business using automated telemarketing calls.

93. Superior Payment Solutions could have restricted Telemarketer from using automated telemarketing, but it did not.

94. Superior Payment Solutions also accepted the benefits of Telemarketer's illegal telemarketing by accepting live transfers of leads directly from Telemarketer despite the fact that those leads were generated through illegal telemarketing.

95. Superior Payment Solutions permitted Telemarketer to place calls on Superior Payment Solutions' behalf as the provider of services without mentioning Superior Payment Solutions' name during the call.

96. Superior Payment Solutions had absolute control over whether, and under what circumstances, it would accept a customer.

97. Superior Payment Solutions determined the parameters and qualifications for customers to be transferred to a live Superior Payment Solutions representative and required Telemarketer to adhere to those requirements.

98. Superior Payment Solutions knew (or reasonably should have known) that Telemarketer was violating the TCPA on its behalf and failed to take effective steps within its power to force the telemarketer to cease that conduct. Any reasonable seller that accepts telemarketing call leads from lead generators would, and indeed must, investigate to ensure that those calls were made in compliance with TCPA rules and regulations.

99. By having Telemarketer initiate the calls on its behalf to generate new business, Superior Payment Solutions "manifest[ed] assent to another person … that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency.

100. Telemarketer transferred customer information directly to Superior Payment Solutions. Thus, the company that Superior Payment Solutions hired has the "ability ... to enter consumer information into the seller's sales or customer systems," as discussed in the May 2013 FCC Ruling.

101. Telemarketer also had the right to bind Superior Payment Solutions in contract, a hallmark of agency.

102. Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships ... through discovery, if they are not independently privy to such information." Id. at 6592-593, ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." Id. at 6593, ¶ 46.

**Officer Liability for Company Conduct**

1. TCPA has 'pierced the corporate veil', allowing individuals to be held personally liable. *See Schumacher v. Capital Advance Solutions, LLC,* No. H-18-0436, 2019 U.S. Dist. LEXIS 34915 (S.D. Tex. Jan. 19, 2019)

**Legal Claims**

Count One: Violation of the TCPA's Do Not Call Provisions

2. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

3. Defendants violated 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)(2) by initiating multiple solicitation calls within a 12-month period to residential telephone numbers despite their registration on the National Do Not Call Registry, without signed, written prior express invitation or permission.

4. The Defendants' violations were negligent and/or willful.

5. Plaintiff prays for relief of $500 per call, unless the Court agrees the actions were willful, in which case Plaintiff prays for relief of $1,500 per call.

6. Plaintiff is entitled to and seeks injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making calls, except for emergency purposes, to any telephone numbers on the Do Not Call Registry.

Count Two: Violation of the TCPA's Automated Call Provisions

7. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

8. The Defendants violated the TCPA (a) by initiating automated telephone solicitations to telephone numbers, or (b) by the fact that others made those calls on its behalf. *See* 47 U.S.C. § 227(b).

9. The Defendants' violations were willful and/or knowing.

10. Plaintiff prays for relief of $500 per call, unless the Court agrees the actions were willful, in which case Plaintiff prays for relief of $1,500 per call.

11. Plaintiff is entitled to and seeks injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making calls, except

for emergency purposes, to any telephone numbers using an Autodialer and/or artificial or prerecorded voice in the future.

Count Three: Violation of the FTC's Telephony Sales Rule

12. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.
13. Defendants violated 16 CFR Part 310 by charging an up-front fee for the telemarketing of credit card balance services.
14. The Defendants' violations were willful and/or knowing.

Count Four: Violation of Georgia's Fair Business Practices Act

15. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.
16. Defendants violated O.C.G.A Sections 10-1-390 et seq. by engaging in a contract they had no intention to honor.


**Relief Sought**

WHEREFORE, Plaintiff prays for the following relief:

A. Injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making calls, except for emergency purposes, to any telephone numbers using an Autodialer and/or artificial or prerecorded voice in the future.
B. Because of Defendants' violations of the TCPA, Plaintiff Walker seeks $500 in statutory damages per violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. § 227(b)(3); 47 U.S.C. § 227(c)(5), which could mean $1,000 in damages per call or – where such regulations were willfully or knowingly violated – up to $3,000 per call.
C. Such other relief as the Court deems just and proper.

**Plaintiff requests a trial as to all claims of the complaint so triable.**

Dated: February 18, 2020                    Respectfully submitted,

                                            s/ Brett Walker

                                            Brett Walker, Plaintiff